Filed 4/29/25  Marriage of Silberberg CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| In re Marriage of DARYL and MARY SILBERBERG | |
| MARY SILBERBERG, Respondent, v. DARYL SILBERBERG, Appellant. | F085618 (Super. Ct. No. RFL-19-000201) **OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Kenneth G. Pritchard, Judge.

Merritt L. McKeon for Appellant.

Cage & Miles, John T. Sylvester for Respondent.

-ooOoo-

# INTRODUCTION

This appeal arises from a marital dissolution action filed by Mary Silberg (Respondent) against Daryl Silberg (Appellant).[1]  Daryl and Mary were married for approximately 30 years and owned significant amounts of community property, the largest of which was an insurance business at which both worked.  The parties' children are all adults, and thus neither custody nor child support issues are relevant here.

The majority of arguments raised in this appeal concern the trial court's division of property between the parties as well as the awarding of spousal support to Mary.  While Daryl makes numerous arguments, most are largely unsupported by citation to the record or authority.  Where an argument is unsupported by appropriate citations, as required by Rule 8.204(a)[2] of the California Rules of Court, we treat that argument as forfeited.  However, to the extent we can discern the basis for Daryl's arguments, we also reject them on the merits.[3]  We find the trial court made a diligent and appropriate review of complex and confusing evidence offered about a family business in which both parties commingled their personal and business expenses, both before and after separation.  Its

---

[1] For clarity, we will refer to the parties by their first names.  We intend no disrespect.

[2] Further references to rules are to the California Rules of Court.

[3] We note Mary filed a motion seeking dismissal of this appeal in its entirety in July 2023.  The motion invoked the doctrine of disentitlement, which is the inherent power held by a Court of Appeal to dismiss an appeal when a party " 'refuses to comply with a lower court order.' " (*In re Marriage of Cohen* (2023) 89 Cal.App.5th 574, 580.) " 'Appellate disentitlement "is not a jurisdictional doctrine, but a discretionary tool that may be applied when the balance of the equitable concerns make it a proper sanction[.]" ' " (*In re A.K.* (2016) 246 Cal.App.4th 281, 285.)  Given the discretionary nature of this tool and considering our Supreme Court's observation that "case law reflects a preference for the resolution of litigation and the underlying conflicts on their merits by the judiciary," we deny the motion to dismiss. (*Kabran v. Sharp Memorial Hospital* (2017) 2 Cal.5th 330, 342–343.)

decisions were supported by substantial evidence, and there is no indication that the court abused any exercise of its discretion.  We therefore affirm the trial court's judgment.

## BACKGROUND

Daryl and Mary married in January 1990 and separated in March 2019, and thus were married for a period of 29 years and 2 months.  The parties enjoyed a "high middle class standard of living" during the marriage and amassed significant community assets.

The most substantial of the community property assets—and the asset around which most arguments on appeal center—is an insurance business, IWV Insurance Agency, LLC ("IWV").  Daryl was an insurance agent in the business of selling insurance through IWV for substantially the entire period of the marriage.  The parties owned IWV jointly, having purchased the business from Daryl's father in January 2014.  Mary was a stay-at-home mother for approximately 11 years of the marriage, during which time she raised the couple's children.  She then worked as a case manager at an unspecified business for a further 12 years.  After the Silberbergs purchased IWV from Daryl's father, Mary began working as the office manager for the business, managing the accounting, payroll, marketing, and advertising for IWV.

For a period of approximately eight months following the March 2019 separation, the parties continued to run IWV together.  Mary filed a petition for dissolution of marriage in August 2019.  In November 2019, the parties reached an impasse in negotiating a division of their property, and Daryl took steps to prevent Mary from further accessing IWV's QuickBooks accounts.

Thereafter, in January 2020, Mary sought temporary spousal support, attorney fees, and an order that Daryl restore Mary's access to all business records from IWV.  Daryl opposed this request, and filed his own request to have a forensic accountant appointed pursuant to Evidence Code section 730.  The court concluded it could not make temporary orders regarding support without an evidentiary hearing, given the allegations made by the parties about the other's conduct in relation to IWV.  The court

3.

granted Daryl's request for a forensic accountant to be appointed, and ordered that Daryl "shall be responsible for all the costs [of] the accountant, subject to reallocation."

The parties stipulated to the appointment of Jared Tonks, a certified public accountant, as the forensic accountant. Tonks was directed to "prepare a conclusion of value of [IWV] at the date of separation and date most current or date most practical near the date of separation and the date of trial." Additionally, given the comingling of personal and business spending via IWV's accounts, Tonks was to investigate "unreported revenue and/or expenses," conduct a post-separation accounting and a "community property balance sheet," and "determine each of the parties' income available for support … including a review of the reasonableness of expenses incurred by the business and adjustments for non-cash expenses."

Tonks offered testimony at a hearing on temporary spousal support in August 2020, following which the parties stipulated to temporary support in the amount of $5,677 per month, with arrears to January 2020 in an amount of $31,904, subject to further modification. Additionally, the parties agreed to temporary attorney fees to be paid to Mary in the amount of $62,500. Shortly thereafter, in December 2020, a status conference was held, wherein Tonks advised his final accounting had been completed, and the parties requested that trial be set. Trial was eventually set for December 2021.

Prior to trial, in February 2021, Daryl requested the amount of temporary support be reduced to $4,581 per month, in accordance with what he represented were Tonks' final reports. He also requested the forensic accountant's bill—which the court directed he pay—be paid from the sale of certain community real property assets. Mary opposed these requests and sought an increase in temporary support. The court determined that, based on the written evidence, testimony, and arguments submitted by Daryl, his income had actually increased since the time of the prior award of temporary support, from approximately $17,500 per month to over $26,000 per month. The court imputed income of $1,500 per month to Mary, given the time that had passed since separation. Further,

the court rejected Daryl's request to pay Tonks from the sale of community property, noting that pursuant to the prior order, Tonks' payment was Daryl's separate obligation and using community assets to pay this would simply create a further debt to the community. The court ultimately increased the temporary support to $6,135 per month in an order issued in August 2021. Daryl subsequently filed a motion to reconsider the increase in support, which is discussed further below.

Prior to commencement of trial in December 2021, the parties stipulated Tonks' final report was admissible, and that Tonks himself was not needed for cross-examination. Despite the stipulation, Daryl raised certain objections to Tonks' report, which were identified in a July 2021 e-mail exchange with Tonks. Tonks responded to this e-mail and the specific concerns raised a few weeks later. The parties stipulated these questions and answers would also be admitted into evidence at trial alongside Tonks' report.

Trial occurred on one day, December 7, 2021. Mary testified the parties ran the business together from the date of purchase until November 2019, with her working as office manager doing the accounting, payroll, marketing, and advertising. Mary had sought employment since her separation from the business, and had been working as a personal assistant. According to Mary, during the marriage the parties enjoyed a comfortable upper middle-class lifestyle, owned a remodeled and updated four-bedroom house as well as several luxury vehicles, and took frequent vacations. Mary testified she was seeking $12,000 per month in spousal support, as well as $200,000 in attorney fees and half the value of the business. Aside from the parties, Daryl's personal accountant, who had prepared taxes for him in recent years, also testified. Daryl also sought to have one of the couple's children testify, although that request was denied, which is discussed in further detail below.

At trial, Daryl testified that he did not object to Tonks' valuation of the business and Tonks' accounting was "correct as far as data entry," although he did "not agree to

5.

characterizations Mr. Tonks used." He also felt it was unlikely the business would continue to earn money at its prior rate due to various changes in insurance industry practices related to his business. According to Daryl, while the valuation was accurate as of the December 2018 date used by Tonks, since that date, the business had lost significant clientele due to a revamping of relationships with the underwriters and significant fires in California. Daryl waived any hearsay objections to Tonks' report and acknowledged that, while he objected to certain characterizations contained therein, he did not object "to the math." The trial court cautioned the parties that if the findings of the forensic accountant were to be challenged, the accountant would need to be called as a witness.[4] Neither party called Tonks to testify.

Daryl requested the business be put up for sale and the proceeds divided, although he expressed concerns about whether an inability to cooperate between the parties would "hinder the sale process." Daryl testified his income remained at least as high as shown on his most current income and expense report submitted to the court, but asserted that he nevertheless had no money to pay Tonks and no money to live on once he had made monthly tax and support payments.

The court filed a tentative statement of decision concerning the distribution of the parties' assets and its anticipated award of spousal support on June 22, 2022, to which both parties submitted objections. The court thereafter filed a document captioned "Response to Respondent's Objections to Proposed Statement of Decision" on August 26, 2022, in which it responded to Daryl's extensive objections in a line-by-line fashion. Daryl thereafter filed additional objections to the court's response, which the court

---

[4] Daryl argued to the trial court that it was prejudicial to require the accountant to testify, because the court had not yet ruled on his prior request for reconsideration to allow him to pay Tonks from income derived from the sale of community real property. The court noted it had already ruled Daryl was responsible for the cost of the forensic accountant, and therefore it "was his responsibility to figure it out."

declined to consider further, noting Daryl "appears to re-argue all issues where he does not like the court's decision."  On July 29, 2022, the court filed a tentative decision regarding attorney fees.  Daryl also filed objections to this tentative decision.

The court issued a judgment on December 2, 2022.  Ultimately, Daryl was awarded ownership of IWV, ordered to pay monthly support of $7,500 to Mary, and make an equalization payment of $453,247.  The court valued IWV at $1,092,000, the valuation given by Tonks.  The court noted that, based on the report and the answers to the questions posed by Daryl, Tonks had "made a good faith effort to evaluate all family assets and debts."  While the accounting methods were not "the ones normally seen by the court," the court observed the conduct of the parties "both before and post separation make[s] such evaluation more [ ] difficult.  Personal asset and debts are commingled with IWV Insurance assets and debts for both parties."

The court concluded IWV would "no longer support the parties in the marital standard of living," and noted Daryl was now taking an annual salary from the business that was "well below the profit being generated despite the loss of business[.]"  The court noted the parties charged various personal expenses to the business, which meant the annual profit of the business was likely higher than even Tonks had calculated.  The court found IWV's net income moving forward should be approximately $280,000 per annum, resulting in about $23,000 per month in income for Daryl, which was the amount the court used to determine support.

Daryl timely appealed from the judgment.

### DISCUSSION

I.      *Standard of Review*

As with other civil cases, factual issues in marital dissolution cases are reviewed for substantial evidence, "indulging all legitimate and reasonable inferences to uphold the court's decision."  (*In re Marriage of Lee & Lin* (2019) 41 Cal.App.5th 698, 702 (*Lee & Lin*); *In re Marriage of Balcof* (2006) 141 Cal.App.4th 1509, 1531 (*Balcof*); *In re*

7.

*Marriage of Klug* (2005) 130 Cal.App.4th 1389, 1398 (*Klug*).) " 'In this regard, the court has broad discretion to determine the manner in which community property is divided and the responsibility to fix the value of assets and liabilities in order to accomplish an equal division. [Citations.] The trial court's determination of the value of a particular asset is a factual one and as long as that determination is within the range of the evidence presented, we will uphold it on appeal.' " (*In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572 (*Campi*).) As always, we review questions of statutory interpretation or pure questions of law de novo. (*Schneer v. Llaurado* (2015) 242 Cal.App.4th 1276, 1287; *In re Marriage of Left* (2012) 208 Cal.App.4th 1137, 1145; *In re Marriage of Dellaria & Blickman-Dellaria* (2009) 172 Cal.App.4th 196, 201.)

" 'A judgment or order of the lower court is *presumed correct*. All intendments and presumptions are indulged to support it on matters as to which the record is silent, and error must be affirmatively shown. This is not only a general principle of appellate practice but an ingredient of the constitutional doctrine of reversible error.' " (*Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*).) "We must accept as true all evidence and all reasonable inferences from the evidence tending to establish the correctness of the trial court's findings and decision, resolving every conflict in favor of the judgment." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 631.) The burden remains on the appellant to demonstrate both error and prejudice for every argument raised on appeal. (*Denham, supra,* 2 Cal. 3d at p. 566; *Hernandez v. California Hospital Medical Center* (2000) 78 Cal.App.4th 498, 502 (*Hernandez*); *Paterno v. State of California* (1999) 74 Cal.App.4th 68, 102 (*Paterno*); *Baldwin v. Baldwin* (1953) 120 Cal.App.2d 493, 494 (*Baldwin*).)

II.     *There is No Error in Tonks' Interview of Daryl While Hospitalized*

It is unclear exactly what Daryl's first assignment of error asserts. At a July 2020 hearing, prior to a temporary support award being issued, counsel noted Daryl had been hospitalized with the COVID-19 virus. Tonks advised the court he had been scheduled to

8.

speak with Daryl regarding the business, but had not been able to do so before the hospitalization. According to Tonks, a draft report of the forensic accounting had been completed, but he was "not comfortable providing an opinion at this time simply due to the fact that the numbers are changing, and [I would] like to speak with [Daryl]." Tonks stated he would need to meet with Daryl prior to offering any opinion that would underlie the award of interim spousal support. He estimated this would take approximately an hour to an hour and a half, and could be completed in multiple 20 or 30 minute sessions, if necessary to accommodate Daryl's health status. The court set the matter out for two weeks, noting the length of time the request for temporary support had been pending at that point, but told Tonks, "if it turns out you're not ready by that time and you need more time, just be honest with us. Okay? We're not trying to push you either." The court made no other orders at that point, and the parties point us to nothing suggesting any further intervention of the court was requested or required in relation to Tonks' interview of Daryl.

The sole legal authority discussed in this section of Daryl's brief is to *Lerma v. County of Orange* (2004) 120 Cal.App.4th 709. In *Lerma*, the court held it was error for the trial court to deny a continuance when the plaintiff's attorney was hospitalized for the removal of his cancerous bladder. (*Id.* at p. 713.) The attorney in *Lerma* was admitted to the hospital on the day the motion was served, and did not actually learn of the motion until being discharged several weeks later, right before the opposition was due. (*Ibid.*) He nonetheless filed a perfunctory opposition as well as a motion for a continuance, explaining the situation, which the trial court denied. (*Id.* at pp. 711–712.) The appellate court held it was error for the court to ignore the obvious fact that "even if all the necessary evidence was contained in files located only 10 feet away from the attorney's desk, there are times when walking those 10 feet, lifting each individual file, and searching through documentation to find each specific item of evidence, is simply beyond human ability." (*Id.* at p. 712.)

It is hard to see what application *Lerma* has to the present case. Neither Daryl nor his counsel ever requested a continuance. Instead, at the hearing where counsel advised the court Daryl was hospitalized, and thus Tonks had been unable to meet with him, the court proposed a course of action that would allow Tonks to fulfill his duties while respecting Daryl's physical limitations. The court inquired whether Tonks could complete his examination of Daryl in 20 to 30 minute increments, if necessary, in case Daryl was unable to manage an entire hour or hour-and-a-half interview in one session. The court set the matter out for several weeks, and advised Tonks he could take more time if it proved necessary and Daryl was ultimately unable to complete the examination. There is no indication in the record that anyone ever suggested more time was needed. There is no indication any party moved for a continuance and there is no indication any party objected to the proposed course of action. It is clear the trial court did not deny any reasonable request for a continuance, because none was requested. We find no error here.

III.    *It was Not Error to Deny Testimony from the Parties' Daughter When the Offer of Proof of Her Testimony was Accepted Into Evidence, Nor Did the Failure to Allow Such Testimony Violate the Constitution*

Daryl claims it was error for the court to deny his request to have the parties' daughter Ali Silberberg testify, as live testimony is required under Family Code section 217, subdivision (a).[5] We disagree.

At a hearing on any order to show cause or motion brought under the Family Code,[6] "absent a stipulation of the parties or a finding of good cause pursuant to

---

[5] Further statutory citations are to the Family Code, unless otherwise indicated.

[6] While we note that Daryl sought to call the couple's adult child at trial, not at a hearing or in response to an order to show cause, Mary does not argue section 217 is inapplicable. We therefore assume without deciding that section 217 applies to trial testimony as well.

subdivision (b), the court shall receive any live, competent testimony that is relevant and within the scope of the hearing and the court may ask questions of the parties." (§ 217, subd. (a).) However, "a court may make a finding of good cause to refuse to receive live testimony and shall state its reasons for the finding on the record or in writing." (§ 217, subd. (b).) In deciding whether to exclude a witness, the court may consider factors such as "[w]hether material facts are in controversy" and "[w]hether live testimony is necessary for the court to assess the credibility of the parties or other witnesses," and must state its reasons in writing, but "is required to state only those factors on which the finding of good cause is based." (Rule 5.113, subds. (b)–(c).)

Daryl sought to have Ali testify about IWV's business practices. Mary objected that the testimony was unnecessary, since the court had ordered a forensic accounting which the parties had stipulated to admit. According to the settled statement, Daryl made an offer of proof of Ali's testimony, which generally concerned "the financial operation of the business during the marriage, during 2019 and 2020, money spent, draws taken by the parties and general business practices. She is an adult daughter of the parties that worked at the insurance company and assisted with data entry and bill paying both before and after the date of separation." The parties stipulated to the offer of proof, which the court accepted, therefore declining to permit her testimony as unnecessary.

Here, the court made the finding required by section 217, specifically concluding the parties had stipulated to the offer of proof from Ali Silberberg. While an offer of proof is not typically a substitute for evidence, it may function as such when the parties stipulate the court may consider it as evidence. (*Espinoza v. Calva* (2008) 169 Cal.App.4th 1393, 1398; *Denny H. v. Superior Court* (2005) 131 Cal.App.4th 1501, 1513.) While no transcript of the trial was presented to us, the minute order from the trial court states expressly "[c]ounsel stipulate to what witness Ali Silberberg would testify to." Further, the settled statement of the parties identifies what the witness generally

11.

intended to testify about, and notes the court "ruled that it was not going to have Ali testify" and "went on to say it accepted [Daryl's trial counsel's] offer of proof."

Clearly, the parties stipulated what the witness's testimony would be, and the court accepted it as though it was given that testimony. Allowing further live testimony from a witness, when the court had already accepted the testimony she was to offer, would be duplicative and irrelevant. Further, there was no apparent reason the court needed to evaluate Ali Silberberg's credibility, as it accepted all of her proffered testimony. Additionally, Daryl stipulated to this course of action, thus waiving any ability to appeal on that basis. (See *Simple Avo Paradise Ranch, LLC v. Southern California Edison Co.* (2024) 102 Cal.App.5th 281, 293 (*Simple Avo*) [noting an appeal generally not permitted from stipulated judgment " 'on the theory that by consenting to the judgment or order the party expressly waives all objection to it, and cannot be allowed afterwards, on appeal, to question its propriety, because by consenting to it he has abandoned all opposition or exception to it' "]; Evid. Code §§ 350, 352.) We find no error in declining to allow Ali Silberberg to testify.

Daryl also appears to separately claim the failure to allow Ali Silberberg to testify was a constitutional violation. The sole case cited for this proposition is *Elkins v. Superior Court* (2007) 41 Cal.4th 1337, which concerned whether a local rule mandating marital dissolution cases proceed solely by written declaration in all except "unusual circumstances" violated due process. (*Id.* at p. 1344.) This authority provides little help for Daryl's argument. First, the Supreme Court did not make a constitutional ruling in *Elkins* about the limits of due process, because it found the local rule at issue was "inconsistent with various statutory provisions." (*Id.* at p. 1345.) Second, there is no such local rule in the present case. And again, Daryl *stipulated* to the use of Ali Silberberg's offer of proof in lieu of her testimony. This means both that Daryl waived any objections to this manner of proceeding and that the testimony to be offered would be irrelevant, since it was already heard and accepted by the court. (See *Simple Avo, supra,*

12.

102 Cal.App.5th at p. 293; Evid. Code §§ 350, 352.) As such, we also find no constitutional error here.

    *IV.*      *Daryl Fails to Establish He Sought to Re-Open the Case After Trial to Permit a New Valuation of the Business*

Daryl asserts it was error for the court to refuse to re-open the case after trial to permit a new valuation of the business. However, Daryl fails to direct us to anywhere in the record suggesting he requested a new valuation of the business after trial. The sole record citation provided by Daryl concerning this argument is from a December 1, 2021, trial confirmation hearing. Trial in this matter began on December 7, 2021. In other words, the request Daryl points to was made *before* trial. This assignment of error therefore cannot be sustained: there clearly was no request to re-open the case after trial. Further, the section of the record cited by Daryl concerns the court discussing a different matter, specifically whether there was a stipulation to sell the business and divide the proceeds, which is completely unrelated to the court's eventual valuation of the business, which, again, at that point had not even yet occurred. When Daryl's counsel sought to make arguments at this hearing about the financial value of the business, the trial court noted, "there's no point arguing about it. We need to have a hearing. 7th is for trial, then; correct? Everybody agree?" Both parties thereafter agreed.

The other record citations in this section are similarly from prior to trial, and reflect Daryl's repeated requests that the court direct the business to be sold. Again, this is not the same as a request to revalue the business after trial. Further, in one of the selections of the record cited by Daryl, he specifically noted he "does not object to the values as placed on the business by Mr. Tonks." It is ultimately unclear what error Daryl complains of here, because there is no indication he ever requested the business be revalued following trial. We find this argument to be forfeited and also without merit.

13.

## V. There Is No Indication the Court Failed to Consider the Factors Set Forth in Family Code Section 4320

Daryl argues next the trial court failed to consider the mandatory guidelines set forth in section 4320. Daryl does not allege error in connection with the court's application of any particular factor in this case, but rather asserts the court simply failed to consider these mandatory guidelines at all. A review of the record in this case reveals this argument is mistaken.

Section 4320 sets out more than a dozen factors, as well as several subfactors, for the court to consider in making a determination regarding spousal support. (§ 4320, subds. (a)–(n).) "Although by statute the trial court must consider section 4320 factors in deciding whether to modify a spousal support order, the statute does not purport to require the court to address each factor expressly." (*In re Marriage of Diamond* (2021) 72 Cal.App.5th 595, 602.) Instead, it imbues the court with discretion to determine the appropriate weight to be given to the various spousal support factors. (*Ibid.*) No authority has been presented suggesting the trial court must specifically delineate each factor and assert how much weight it is assigning to each. Of course, the court must not be arbitrary: it "must exercise its discretion along legal lines, taking into consideration the applicable circumstances of the parties set forth [by statute], especially their reasonable needs and financial abilities." (*In re Marriage of Prietsch & Calhoun* (1987) 190 Cal.App.3d 645, 655.)

Here, it is clear the trial court considered the relevant factors. First, the court expressly stated, "All Family Code Section 4320 factors have been considered," in its written ruling. The court also indicated on Form FL-343—the Spousal, Domestic Partner, or Family Support Order Attachment, promulgated by the Judicial Council of California—that it considered the parties' evidence regarding each of the section 4320 factors. It then also completed Form FL-349—captioned Spousal or Domestic Partner Support Factors Under Family Code Section 4320, again promulgated by the Judicial

14.

Council—on which it considered the various factors and even included substantial written comments explaining its reasoning. Clearly, the court did not fail to consider the section 4320 factors.

It appears the reason Daryl may believe the trial court did not consider the required factors is because it did not check *every* box on Form FL-349. However, from this we make the unremarkable assumption that the factors for which the court made no notations and included no comments are factors which did not weigh heavily or at all in the court's weighing of its discretion, such as the age and health of the respective parties under section 4320, subdivision (h). This is hardly a great leap of logic, given the court also specifically stated it had considered all the factors, filled out the appropriate forms, and included substantial, specific written comments. Again, Daryl does not complain the court misapplied or failed to adequately weigh any particular factor, but instead appears to rest his argument on a wholesale failure of the court to consider the factors. This argument has no merit.

Daryl includes a separate argument in this section of his brief under a subheading entitled "Expert's Analysis of Support Income/Court's Ambiguous Ruling." It is unclear from the briefing whether this is intended to be a related argument, as we note a seemingly similar argument made later in the briefing. Indeed, it is unclear what exactly Daryl is arguing. First, he appears to take issue with the trial court's failure to "make any specific rulings requested by [a]ppellant in his Request for [Statement of Decision] or in his Issues raised on objection to the [Statement of Decision]." This statement is puzzling, to say the least. The trial court issued a *lengthy* response to the itemized list of requests made by Daryl in his objections and request for a statement of decision. This included approximately 60 specific itemized requests. The court did not fail to make "any specific rulings" requested by Daryl. Instead, it made a plethora of such rulings.

Daryl then appears to take issue with the manner in which the trial court arrived at its conclusions regarding Daryl's income, because it purportedly did not recognize certain

15.

taxes or an unspecified promissory note he claimed to owe. Daryl's brief also appears to criticize the trial court's alleged failure to specify the character of the income Daryl earned, specifically whether it was "[c]orporate [p]rofit" or "[e]mployment income," and whether it was net or gross. We are unclear what any of this has to do with the section 4320 factors concerning spousal support. Regardless, these arguments seemingly ignore that the appellate court's role in relation to factual matters such as this one is limited to evaluating whether there is substantial evidence to support the court's ultimate finding. (*Lee & Lin, supra*, 41 Cal.App.5th at p. 702; *Balcof, supra,* 141 Cal.App.4th at p. 1531; *Klug, supra,* 130 Cal.App.4th at p. 1398.) Daryl provides neither a compelling nor cogent explanation of how these alleged failures, assuming they occurred, show the court's ultimate factual conclusions were not supported by substantial evidence. Whatever Daryl's precise claim of error is here, it gives us no pause in affirming the judgment.

VI.    *Daryl Has Failed to Carry His Burden to Demonstrate Error Based on the Trial Court Exceeding Its Jurisdiction to Award Temporary Spousal Support*

Daryl next argues the trial court inappropriately awarded arrears for spousal support that predated the filing of the petition, and thus were outside of the court's jurisdiction to award. Mary seemingly concedes spousal support may not be ordered prior to the date of the filing of the petition, but contends this is not what occurred. Instead, she claims the reference to support with which Daryl takes umbrage was an improvidently worded item on an accounting schedule that was a component of equalizing the distribution of property. Because the record citations to which Daryl points us are incomplete copies of a document—only the schedules, but not the larger accounting to which the schedules were attached—we have no basis to overturn the trial court's finding.

16.

It is well-accepted the purpose of temporary spousal support orders differs from that of permanent spousal support orders. (*In re Fawcett's Estate* (1965) 232 Cal.App.2d 770, 783–784 ["Pendente lite allowances and permanent allowances differ fundamentally in nature [citation] and function [citation]."].) During the pendency of any marital dissolution proceedings, the court may order "either spouse to pay any amount that is necessary for the support of the other spouse," subject to certain limitations not applicable here. (§ 3600.) "The manifest purposes of pendente lite allowances to a [spouse] are to enable her to live in her accustomed manner pending the disposition of the action and to provide her with whatever is needed by her to litigate properly her side of the controversy. … Thus, the general rule is that the propriety of pendente lite allowances to a [spouse] turns primarily upon the sufficiency of her showing of need for them." (*Loeb v. Loeb* (1948) 84 Cal.App.2d 141, 144–145.) "On the other hand the object of permanent allowances is to make an equitable apportionment between the parties." (*Id.* at p. 146; see also *In re Marriage of Dick* (1993) 15 Cal.App.4th 144, 166 (*Dick*).) Because the purpose of a temporary spousal support order is to provide support during the pendency of litigation, based primarily on need, courts have reasonably assumed the ability to order such a payment begins with the court's acquisition of jurisdiction. (See *Dick, supra*, 15 Cal.App.4th at p. 166 [noting court found "jurisdiction to make the award commenced upon wife's filing of her petition for legal separation[.]"].) In the absence of argument or authority to the contrary, we assume likewise. What the parties dispute is whether this is what, in fact, occurred.

Daryl directs us to pages 1050 and 1051 of the Clerk's Transcript in this case. On page 1050, which is captioned as "Schedule B / Post-Separation Accounting of Community Funds / Business Awarded to Daryl Silberberg at the Date of Separation / For the Period Beginning February 1, 2019 through September 30, 2020," there is a line item that states, "Retroactive Support to Date of Separation," and shows a negative balance of $63,180 allocated to Daryl and a positive balance of $63,180 allocated to

Mary. On page 1051, there is a note explaining this amount was calculated by multiplying a monthly spousal support amount of $6,318 by the number of months between March 2019—the date of separation—and the end of the year.[7] This and numerous other figures resulted in a final reconciliation which showed Daryl entitled to $20,882 from whatever property was accounted for in Schedule B, and showed Mary owing $3,159 in relation to this property. A review of the surrounding portions of the Clerk's Transcript shows merely the schedules, but not the larger accounting which the schedules were obviously intended to support. Because of this, there is no explanation in the record to which we are cited which shows what property or account was being reconciled in this schedule. Daryl further states the court later adopted these figures in its order; that order at least clarifies these amounts are related to "liabilities," and specifically "credits" and "reimbursements," although this again provides little clarity about the purpose of this accounting or what this specific schedule was intended to reflect. Ultimately, Daryl contends this accounting was tantamount to an order for temporary spousal support pursuant to section 3600 which predated the filing of the petition, and was therefore beyond the court's jurisdiction.

Mary argues this was not a temporary spousal support order. In support of this, Mary points to the fact that this part of the accounting was adopted by the court as part of its distribution of the couple's *property*, not as part of a support order. This is, indeed, what is reflected in the record. Further, in his itemized list of objections to the court's tentative ruling, Daryl sought an explanation of the court's approval of what he called the "spousal support liability" from March 2019 to December 2019 assigned by Tonks, to which the court responded that it "did not award any spousal support" for that period.

---

[7] The petition in this case was filed in August 2019, and thus the period between March and December 2019 includes time both pre-dating and post-dating its filing.

18.

Daryl also sought an explanation from the accountant, Tonks, about the method of accounting used here, which helps elucidate what these lines in the accounting schedule may reflect. Tonks explained in a written response to questions posed by Daryl: "There are two approaches to accounting for funds after the date of separation, 1) The first approach is to account for the balances as of the date of separation and charge the party with the balance of the accounts they control as of the date of separation, 2) The second approach is to account for the balances as of the date of trial and perform a post separation accounting and determine the amounts received by each party after the date of separation. When the parties use the same bank account post-separation, then a post-separation accounting is required." As is readily conceded by the parties and repeatedly noted by the trial court, the parties commingled their business and personal finances both during their marriage and for a period of at least six months after their separation. This created considerable difficulty in appropriately accounting for and dividing the assets of the couple. Thus, it appears these lines on Schedule B may reflect adjustments made based on an assumed average amount spent by or attributable to Mary for her support during this period.[8]

While we tend to find Mary's explanation more probable, it is ultimately unclear what precisely was meant by the forensic accountant in the specific line of text in the schedule about which Daryl complains. The significance of these notations within the larger accounting is not readily apparent. Tonks, the author of the accounting, did not testify at trial, and so was not asked to explain them, except insofar as covered by the e-mails referenced above. However, it does seem the trial court adopted these figures as part of its division of community property. It thus was not an award of temporary spousal support pursuant to section 3600. At the very least, Daryl has not pointed us to

---

[8] We note the trial court never made any support order in the amount of $6,318, so far as we can tell, and there is no inherent reason to believe this is reflective of a court-directed award of support.

19.

anything establishing otherwise. As always, Daryl bears the burden of demonstrating both error and prejudice for every argument raised on appeal. (*Denham*, *supra*, 2 Cal. 3d at p. 566; *Hernandez*, *supra*, 78 Cal.App.4th at p. 502; *Paterno*, *supra*, 74 Cal.App.4th at p. 102; *Baldwin*, *supra*, 120 Cal.App.2d at p. 494.) He has failed to do so here, and we therefore find no merit to this argument.

VII.     *The Motion for Reconsideration is Not an Appealable Order*

As referenced above, Daryl filed a motion to reconsider the trial court's August 2021 increase in temporary support and denial of a request to pay for Tonks' accounting out of the sale of community property. It is unclear exactly what legal error Daryl believes the trial court committed in denying the motion for reconsideration. However, we do not reach the merits on this particular issue. A motion for reconsideration is not itself an appealable order, and Daryl failed to appeal the order to which it is connected, thereby forfeiting any appeal connected to this reconsideration request.

Any party may seek reconsideration of any motion or request for order from the trial court by making a timely showing of "new or different facts, circumstances, or law" that warrant modifying, amending, or revoking the prior order.[9] (Code Civ. Proc., § 1008, subd. (a).) An order denying a motion for reconsideration is not separately appealable, but "if the order that was the subject of a motion for reconsideration is appealable, the denial of the motion for reconsideration is reviewable as part of an appeal from that order." (Code Civ. Proc., § 1008, subd. (g).) The parties agree the motion for reconsideration is not independently appealable, and may only be appealed if Daryl also appeals the original order granting temporary spousal support and directing him to pay for the accounting. Temporary support orders are immediately appealable under the collateral order doctrine. (*In re Marriage of Skelley* (1976) 18 Cal.3d 365, 368–369; *In*

---

[9] It does not appear, based on the briefing here and below, that any new facts were involved here, but rather that Daryl disagreed with the manner in which the trial court interpreted the facts presented.

20.

*re Marriage of Murray* (2002) 101 Cal.App.4th 581, 595, disapproved of on other grounds in *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1010 fn. 7.)

"If any party serves and files a valid motion to reconsider an appealable order under Code of Civil Procedure section 1008, subdivision (a), the time to appeal from that order is extended for all parties until the earliest of: (1) 30 days after the superior court clerk or a party serves an order denying the motion or a notice of entry of that order; (2) 90 days after the first motion to reconsider is filed; or (3) 180 days after entry of the appealable order." (Rule 8.108(e).) Thus, the filing of a motion to reconsider extends the time to appeal to, at most, 180 days from the date of the appealable order. (See also rule 8.104(a)(1)(c).)

Here, Daryl did not timely appeal the pendente lite order directing him to pay temporary spousal support and refusing to allow him to pay for Tonks' accounting from the sale of community property. Such an order "is operative from the time of pronouncement, and it is directly appealable." (*In re Marriage of Gruen* (2011) 191 Cal.App.4th 627, 637.) " 'If an order is appealable, ... and no timely appeal is taken therefrom, the issues determined by the order are res judicata.' " (*Id.* at p. 638.)

Here, the motion to reconsider concerned an order issued on August 19, 2021. The filing of the motion to reconsider extended the time to appeal to, at most, 180 days after the entry of the appealable order. Thus, the time to appeal the order on temporary support ran on February 15, 2022. The notice of appeal was filed almost a year later, on January 25, 2023, and designates only an appeal from a judgment after court trial. By this point, the court's earlier pendente lite orders regarding temporary support were already res judicata. We cannot and do not consider any challenges in this appeal to the propriety of denying the motion for reconsideration of the temporary support orders.

### VIII. *The Trial Court Did Not Err in Its Division of Property*

Daryl next objects to the trial court's division of property. While the precise nature of Daryl's arguments is elusive, he seems to argue the court allowed Mary to

engage in "double dipping" by awarding her both spousal support and half of the value of the business. It is unclear whether Daryl is arguing that the trial court erred because its ruling is ambiguous as to the nature of the award—and therefore it is unclear whether Mary "double-dipped"—or because its division of the property was inequitable. Regardless, we find no error.

The fundamental principle of the court in dividing community property is equity. (§ 2550.) In doing so, " 'the court must distribute both the assets and the obligations of the community so that the residual assets awarded to each party after the deduction of the obligations are equal.' " (*In re Marriage of Walrath* (1998) 17 Cal.4th 907, 924.) The manner of distribution is a matter trusted to the sound discretion of the trial court. (*In re Marriage of Connolly* (1979) 23 Cal.3d 590, 603; *Dallman v. Dallman* (1958) 164 Cal.App.2d 815, 819.)

Daryl cites no authority suggesting a court's lack of perfect clarity in its written rulings is a basis for concluding it abused its discretion. Again, all assignments of error must be demonstrated by the appellant in order to succeed on appeal. (*Denham*, *supra*, 2 Cal.3d at p. 566; *Hernandez*, *supra*, 78 Cal.App.4th at p. 502; *Paterno*, *supra*, 74 Cal.App.4th at p. 102; *Baldwin*, *supra*, 120 Cal.App.2d at p. 494.) A failure to cite supporting legal authority means Daryl cannot carry his burden to show error or prejudice. (*McComber v. Wells* (1999) 72 Cal.App.4th 512, 522 [" '[E]very brief should contain a legal argument with citation of authorities on the points made. If none is furnished on a particular point, the court may treat it as waived, and pass it without consideration.' "].)

Even assuming that ambiguity in a trial court's ruling could reach the level of severity where it violates due process, we find no lack of clarity here. The court made a clear decision about spousal support, concluding the business generated a net income of approximately $23,000 per month to Daryl, using this as the basis for concluding Daryl was able to pay spousal support. It concluded this was a marriage of long duration and

cautioned Mary pursuant to *In re Marriage of Gavron* (1988) 203 Cal.App.3d 705 that she must seek to become self-supporting, but also noted it did not anticipate she would ever be able to generate self-income to reach the marital standard. The court noted Mary had not obtained full-time employment, despite having marketable skills, and therefore imputed a monthly income to her in the amount of $3,500. It also noted the couple enjoyed a high middle-class standard of living during the marriage, and Mary was "usually home" with the couple's children while they were growing up, although they were all now adults.

The court also made a clear division of community property. Its order spanned multiple pages dividing the significant amount of property the parties had amassed between the two of them. The most complex of the assets to value was clearly the business, IWV Insurance, which the court valued at $1,092,000. In arriving at this figure, it noted a variety of issues that complicated the valuation of the business, including the COVID-19 pandemic, the recent growth of California wildfires and its effects on the insurance industry, and especially the commingling of personal assets and debts within IWV both before and after separation. The court concluded that, given all the difficulties in valuing this business, the court-appointed accountant "made a good faith effort to evaluate all family assets and debts"; further, both parties stipulated to the admission of his report as evidence along with the questions and answers posed by Daryl's attorney. The court noted Daryl did not call Tonks as a witness, question him at trial, or ask further questions of him in a written format. Accordingly, it used Tonks' report to value the business, noting he "did an excellent job of how to best evaluate the problems presented."

Additionally, the trial court made other findings noting the problematic nature of the evidence presented to it. As observed by the court, Daryl "repeatedly argued that he was financially hurting, as the income of his business has changed. [Daryl] on cross-examination would then admit to substantial income." Further, Daryl "would only offer selected business records into evidence," and revealed substantial sources of income

23.

which he did not count as sources of income, such as forgiven loans. The court also observed Daryl appeared to still be commingling his personal expenditures with his business, which essentially disguised some portion of his income. The court noted it set Daryl's income at a lower level than he had previously earned, based on his arguments about the loss of business in recent years. However, it further commented Daryl "does not appear to be able to understand the liabilities and obligations of his own business." Daryl was "unable or unwilling to provide easy clarity of his financial situation. His lack of tax returns for 2020 and 2021, the ongoing use of the business to pay personal expenses, business expenses claimed as personal debt, and so forth have made his financial situation very difficult to evaluate. [Daryl], three years plus since separation[,] provided confusing evidence at trial." It also noted the parties "have consumed a large portion of their net worth in fighting. The parties have spent on their dissolution in the manner the parties have spent during their marriage." Elsewhere the court observed, "[t]he parties appear to have spent lavishly on themselves without concern for the future."

Based on these and other factors, the court ordered Daryl to make a monthly support payment in the amount of $7,500, an equalization payment of $453,247, and pay attorney fees of $150,000. Our review of the record does not reflect ambiguity in the judgment beyond that implicit in the conflicting, incomplete, and ambiguous evidence presented by the parties. Instead, our review of the decision suggests an extremely diligent attempt to sort through significant amounts of disputed and confusing evidence by two obstreperous parties, including the trial court providing detailed responses to extensive objections from Daryl.

To the extent Daryl is attempting to raise specific objections to the Tonks report, we note he stipulated to its admission into evidence and failed to cross-examine Tonks about the questions he now raises. Thus, Daryl has forfeited any ability to complain about errors that are not readily apparent from the face of the stipulated evidence. (*In re Marriage of S.* (1985) 171 Cal.App.3d 738, 745; *Long v. Long* (1967) 251 Cal.App.2d

732, 737.) More importantly, Daryl fails to explain how the trial court's ruling is not supported by substantial evidence, which is the applicable appellate standard. (*Lee & Lin*, *supra*, 41 Cal.App.5th at p. 702; *Campi*, *supra*, 212 Cal.App.4th at p. 1572; *Balcof*, *supra*, 141 Cal.App.4th at p. 1531; *Klug*, *supra*, 130 Cal.App.4th at p. 1398.) Daryl's mere disagreement with the evidence is irrelevant on appeal.

To the extent Daryl argues it is "double dipping" to direct spousal support payments based on the entire anticipated profit of the business, as well as award Mary half the "profit of the business," we make several notes. First, the trial court did not award Mary half the value of the business. Rather, the court tabulated dozens of community property assets and effectuated an equitable division of those assets. Since the business was awarded to Daryl in its entirety and was one of the larger community property assets, Daryl was ultimately ordered to pay an equalization payment. This is not the same thing as awarding Mary half the "profit of the business." The business as an asset was indisputably awarded entirely to Daryl, and thus he—and only he—will enjoy its profits moving forward.

Second, the award of spousal support and the award of community property are fundamentally separate questions. The purpose of dividing property is to effectuate an equal distribution of community property. (§ 2550.) The purpose of spousal support is subject to questions of equity and justice that vary widely based on the circumstances of the case. (*In re Marriage of Smith* (1990) 225 Cal.App.3d 469, 480–481 [noting the Legislature has not specified a purpose of spousal support, because "[t]he purposes of spousal support inevitably vary from case to case, depending upon the parties and the facts and circumstances of the case"].) Daryl has cited no authority suggesting it is an abuse of discretion to award property to one spouse which may continue to generate income which could then be used to pay spousal support, while also ordering an equalization payment.

Third and lastly, the business was valued as a going concern, which is an asset with a specific monetary value. Mary was not awarded half the profits of the business on a going-forward basis; rather, the equalization payment was in consideration of the fact that Daryl received sole ownership of the entire business, which was a significant community asset. This was a valuation of the business at a particular place and time, not a requirement that Daryl account for the profits of the business to Mary and pay half of them to her in the future.

Ultimately, regardless of the precise nature of the argument being made by Daryl here, we find no error.

IX.     *Daryl's Argument About Separate Property Being Used for Community Expenses Makes No Clear Assignment of Error*

In his next assignment of error, Daryl includes a number of legal citations concerning when a spouse is due reimbursement from the community for using separate property to pay community debts. He then asserts: "*If* Respondent/Wife's charges on the credit cards on the line of credit were debts of the community, *to the extent* that such funds were used for purposes other than the community, such as to maintain wife's standard of living, the community *would be* entitled to reimbursement (or, more particularly, then she *should have been* charged with such debt separately, without offset)." (Italics added.) The sole concrete fact referenced in this section is a line item purportedly showing Mary "paying her attorney after the date of separation … a total of $88,292 out of her separate credit cards and her separate bank accounts." We can think of no reason it would be improper for a party to pay her own attorney out of her own separate property.

To the extent this argument presents the court with a mere hypothetical, without citation to anything in the record showing this hypothetical actually occurred, we decline to respond, as this court does not sit to answer hypothetical questions. (See *Newland v.*

26.

*Kizer* (1989) 209 Cal.App.3d 647, 657; *Wilson v. Transit Authority of City of Sacramento* (1962) 199 Cal.App.2d 716, 722–723.)

> X. *It is Unclear What Daryl Is Arguing in Relation to Attorney Fees, But Lacking a Clear Assignment of Error, There is No Basis to Reverse*

Daryl next includes an assignment of error in which he cites numerous authorities concerning the award of attorney fees to a party in a marital dissolution case. However, Daryl then argues: "Clearly, as the trial court here failed to rule on [Daryl's] RFO for community funds to pay the Expert to testify at trial, until the very day of trial, Daryl shows prejudice, as one of the reasons for the court making its property rulings was that Daryl did not call the expert to testify at trial." It therefore appears Daryl's argument here has nothing to do with the award of attorney fees in this case, but rather is related to the denial of his request for reconsideration. However, as addressed *supra*, the request for reconsideration is not an independently appealable order, and Daryl failed to appeal from the original pendente lite order setting temporary spousal support and directing him to pay for the accounting. We decline to reconsider this issue, and note it has no apparent relationship to the award of attorney fees.

> XI. *The Trial Court Need Not Detail Every Evidentiary Finding In Its Statement of Decision, and Daryl's Argument that the Trial Court Failed to Issue a Statement of Decision is Simply Wrong*

The penultimate argument made by Daryl here is that the trial court erred by failing to issue an adequate statement of decision. While this is similar to an argument discussed earlier, we address it separately to ensure it is given full consideration. We note Daryl again fails to support this argument with any citations to the record, so it is unclear which aspects of the decision were inadequately explained, from Daryl's point of view. This alone is sufficient to forfeit this argument. (Rule 8.204(a)(1)(C); *Dietz v. Meisenheimer & Herron* (2009) 177 Cal.App.4th 771, 800–801; *Regents of University of California v. Sheily* (2004) 122 Cal.App.4th 824, 826 fn. 1.)

Moreover, even were we to reach the merits of this argument, we would not agree with Daryl. "The court shall issue a statement of decision explaining the factual and legal basis for its decision as to each of the principal controverted issues at trial upon the request of any party appearing at the trial." (Code Civ. Proc. § 632.) However, "it is settled that the trial court need not, in a statement to decision, 'address all the legal and factual issues raised by the parties.' " (*Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 559.) "[I]t need do no more than state the grounds upon which the judgment rests, without necessarily specifying the particular evidence considered by the trial court in reaching its decision." (*Muzquiz v. City of Emeryville* (2000) 79 Cal.App.4th 1106, 1125.) "[A] trial court rendering a statement of decision under Code of Civil Procedure section 632 is required to state only ultimate rather than evidentiary facts because findings of ultimate facts necessarily include findings on all intermediate evidentiary facts necessary to sustain them." (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 599.) "The trial court is not required to make an express finding of fact on every factual matter controverted at trial, where the statement of decision sufficiently disposes of all the basic issues in the case." (*Bauer v. Bauer* (1996) 46 Cal.App.4th 1106, 1118.)

Here, the trial court not only rendered an adequately written statement of decision, but specifically responded to a plethora of interrogatories from Daryl about that decision, which were presented in the form of objections.[10] In our view, the court was diligent in responding to Daryl's objections and more than adequately explained the basis for its decision. We would find no merit in Daryl's argument about the inadequacy of the statement of decision, even if we did not find it forfeited.

---

[10] To the extent Daryl argues the trial court did not issue a statement of decision at all, he is simply wrong.

*XII.* *Daryl Provides No Legal Authority for the Use of Either a Cumulative or Structural Error Analysis in This Case*

Lastly, Daryl requests that, even if we find no error sufficiently prejudicial to warrant reversal, we consider prejudice cumulatively, or consider the errors to be structural in nature, such that prejudice is presumed and no harmless error inquiry is conducted. This approach has been used at times for constitutional violations, mostly in criminal cases. (See *Chapman v. California* (1967) 386 U.S. 18, 23 fn. 8 [noting criminal cases in which structural error has been found].) Our Supreme Court has also suggested that there could conceivably be a civil case in which structural error considerations applied. (See *In re Christopher L.* (2022) 12 Cal.5th 1063, 1074; but see *id.* at p. 1082 [declining to adopt that approach in that case].) However, Daryl provides no legal authority suggesting that either cumulative error or structural error are appropriate in this case for approaching the prejudice analysis. Additionally, since we do not find Daryl has demonstrated any errors by the trial court, we need not reach prejudice in any event.

## DISPOSITION

For the above reasons, we affirm the trial court's judgment. Mary shall recover the costs of this appeal.

SNAUFFER, J.

WE CONCUR:

PEÑA, Acting P. J.

MEEHAN, J.

29.